## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

KATHLEEN BRITT, individually and
As the Surviving Parent of Jason Britt, and
As Personal Representative on behalf of
JASON BRITT, deceased

      **Plaintiffs,**

  v.

AGAPE BAPTIST CHURCH INC., d/b/a
AGAPE BOARDING SCHOOL,
JULIO SANDOVAL, *individually and in his
role As Dean of Students for Agape Boarding
School,*
SAFE, SOUND AND SECURE YOUTH
MINISTRIES, INC.,
BRENT JACKSON, *Individually and in his role
as Vocational Director and Staff Member for
Agape Boarding School,*
SCOTT DUMAR, *Individually and in his role
as Medical Director, Member of the Board of
Directors and Staff Member for Agape Boarding
School,*
JON WILKE, *Individually and in his role as
Staff Member for Agape Boarding School,*
DAVID WILSON, *Individually and in his role
as Staff Member for Agape Boarding School,*
ROBERT GRAVES, *Individually and in his
role as Staff Member at Agape Boarding School,
and Individually and as Deputy Sheriff for
Cedar County, State of Missouri,*
CEDAR COUNTY SHERIFF'S
DEPARTMENT,
JAMES "JIMBOB" McCRARY, SHERIFF, in
his Individual and Official Capacity,

      **Defendants.**

**Case No.: 6:23-cv-03316-MDH**

1

## ORDER

Before the Court is Defendants Robert Graves, Sheriff James "Jimbob" McCrary and Cedar County's ("Cedar County Defendants") Motion to Exclude/Daubert Motion to exclude all testimony of Plaintiff's disclosed expert Dr. Stephen Peterson, MD ("Dr. Peterson") as it relates to the Cedar County Defendants (Doc. 171). Additionally, Defendant Agape Baptist Church ("Agape") has also filed a Motion to Exclude Testimony of Plaintiff's Expert Dr. Peterson. (Doc. 173). Cedar County Defendants filed Suggestions in Support (Doc. 172), Plaintiff filed Suggestions in Opposition to both motions (Doc. 180), and Cedar County Defendants have filed a reply. (Doc. 186). Defendant Agape has failed to file a reply and the time to do so has elapsed. The motions are now ripe for adjudication on the merits. For the reasons stated herein, Cedar County Defendants' Motion to Exclude/Daubert Motion is **GRANTED** and Defendant Agape's Motion to Exclude Testimony of Plaintiff's Expert Dr. Peterson is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

This is a wrongful death case where Plaintiff Kathleen Britt, alleges that child abuse inflicted upon her son Jason Britt ("Decedent") at Agape Boarding school from 2009 to 2010 lead to his death more than ten years later. Dr. Peterson is Plaintiff's sole expert designed to address medical causation. Dr. Peterson created a Diagnostic Record Review ("Report") in this case where he opines on his findings, discussion and causation stemming from articles from the Kansas City Star, the Decedent's Suicide Note, and the documents filed in this case. Dr. Peterson's Report was submitted on May 9, 2025. Additionally, Dr. Peterson was deposed in this matter and asked about his Report and other matters related to his conclusions. Both Cedar County Defendants and

2

Defendant Agape bring separate motions looking to exclude the testimony of Dr. Peterson. The Court will take each of these motions in turn.

**STANDARD**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court interpreted the then-effective version of Rule 702 of the Federal Rules of Evidence to require district courts to be certain that expert evidence based on scientific, technical, or other specialized knowledge is "not only relevant, but reliable." 509 U.S. 579, 590 (1993). The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue." *Id.* at 592–93.

Post-*Daubert* amendments to Rule 702 clarify the standard:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also* Fed. R. Evid. 702 advisory committee's note to the 2000 amendment ("Rule 702 has been amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and to the many cases applying *Daubert* …." (citations omitted)).

The Eight Circuit has expounded the Rule 702 standard. Proposed expert testimony must meet three criteria to be admissible under Rule 702. "First, evidence based on scientific, technical,

3

or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevance." *United States v. .55 Acres of Land, More or Less, Situated in City of St. Louis, Missouri*, No. 4:22-CV-01050-SRC, 2024 WL 960941, at *2 (E.D. Mo. Mar. 6, 2024) (quoting *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citations omitted)). "Second, the proposed witness must be qualified to assist the finder of act." *Id.* (citation omitted). "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id.* (citations and internal quotation marks omitted). To meet the third criterion, the testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quoting Fed. R. Evid. 702(b)–(d))).

"Federal Rule of Evidence 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007) (citing *Lauzon*, 270 F.3d at 686). The rule "favors admissibility if the testimony will assist the trier of fact." *United States v. .55 Acres of Land, More or Less, Situated in City of St. Louis, Missouri*, No. 4:22-CV-01050-SRC, 2024 WL 960941, at *2 (E.D. Mo. Mar. 6, 2024) (quoting *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998)). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Id.* (citation and internal quotation omitted).

**DISCUSSION**

**I.      Cedar County Defendants' Motion to Exclude Testimony**

4

Cedar County Defendants argue that Dr. Peterson's testimony is inadmissible against them. Specifically, Cedar County Defendants argue that Dr. Peterson admitted that he lacked facts to form an opinion against Defendants McCrary, Graves or Cedar County, Missouri at his deposition and that any such opinion would be speculative. Cedar County Defendants assert that because Dr. Peterson does not have facts showing whether the Cedar County Defendants had any involvement in any acts or omissions leading to Jason Britt's death, that Dr. Peterson's testimony on this point would not be helpful to the jury to understand any facts or issues relevant to this case. Lastly, Cedar County Defendants argue that Plaintiff disclosed no further opinions to the County Defendants regarding their causing Jason Britt's death, or causing him any harm, and the May 9, 2025, expert designation deadline and discovery deadlines have passed. Thus, Plaintiff is unable to supplement any disclosures of Dr. Peterson.

Plaintiff argues that Dr. Peterson's opinions are that the abuse that Jason Britt suffered at Agape Boarding School caused Jason Britt to use methamphetamine, other illicit drugs and high doses of anabolic steroids and other performance enhancing drugs, which caused his death. Plaintiff states that Dr. Peterson's opinion that the gang rape and other abuse at Agape caused Jason Britt's death and that proof that Plaintiff provides that Defendant Graves was part of the gang rape and other abuse at Agape would fall within Dr. Peterson's opinion. Plaintiff does concede that Dr. Peterson did not mention Defendant McCrary specifically, but posited that those who colluded with Agape were complicit in the damage caused to Jason Britt. Plaintiff argues that Defendant McCrary's testified that during his tenure as both a law enforcement officer and as Sheriff, there were no 'investigations" whenever children ran away from Agape, and those kids were just returned. Plaintiff argues that Dr. Peterson's opined that if Cedar County law enforcement was

5

forcing the children back to Agape, it acted to silence the boys and would have contributed to cause the Decedent's death.

### A.     Defendant McCrary

The Report and deposition testimony provided by Dr. Peterson would not assist the trier of fact as it relates to Defendant McCrary. Nowhere within Dr. Peterson's Report does he mention Defendant McCrary by name or allude to personal wrongdoing by Defendant McCrary. (Doc.180-2).  Additionally, during Dr. Peterson's deposition, he was asked whether he had formed an opinion regarding Defendant McCrary which shows the following conversation:

> Q.     In those pleadings if you look there will be statements and agreements that Sheriff McCrary did not become the sheriff of Cedar County until 2017. So assuming that is correct, are you going to offer any opinions regarding Sheriff McCrary at the trial of this case?
>
> A.     I'm going to say provisionally I can't answer one way or the other because I don't know what the other -- what the depositions of the people who worked at Agape say at this point. I don't know Sheriff McCrary's involvement prior to becoming sheriff.
>
> Q.     And you haven't seen anything at least as of today's date that would allow you to have formed an opinion regarding Sheriff McCrary; is that fair?
>
> A.     Yes, one way or the other. I mean, I have Mr. Dudley and Mr. Britt's statements that some of the men were either sworn officers or volunteer officers or something like that and that's a red flag, but I don't have the full data yet.
>
> Q.     Okay. So as you sit here today, you have no opinions about Sheriff McCrary but to be fair to you it sounds like if you do additional work in this case, that may or may not change. Is that right?
>
> A.     That's absolutely correct.

(Doc. 172-1, page 10 line 3 - page 11 line 6). While Dr. Peterson has opined about the alleged trauma that was inflicted upon Jason Britt while at Agape, nothing within his Report or deposition would assist the trier of fact in finding Defendant McCrary's role with either the Cedar County Sheriff's Department or Agape from 2009 to 2010. For these reasons, Cedar County Defendants'

6

Daubert Motion to exclude all testimony of Plaintiff's expert Dr. Peterson as it relates to Defendant

McCrary is **GRANTED**.

**B.** **Defendant Graves**

The Report and deposition testimony provided by Dr. Peterson would not assist the trier of

fact as it relates to Defendant Graves. Nowhere within Dr. Peterson's Report does he mention

Defendant Graves by name or allude to personal wrongdoing by Defendant Graves personally.

(Doc.180-2). Additionally, during Dr. Peterson's deposition, he was asked about whether he had

formed an opinion regarding Defendant Graves which shows the following conversation:

> Q. Okay. Robert Graves did not become a deputy with the Cedar County Sheriff's Department until 2017. Did you recall seeing that in the pleadings?
>
> A. If that's a matter of fact, that's accurate. I don't remember the specific date.
>
> Q. Okay. Well, assuming that that is an accurate fact, then you would not have any opinion that Robert Graves as a deputy of Cedar County had any interaction or caused any abuse or the death of Jason Britt; correct?
>
> …
>
> A. Yes, my answer is that it was my impression that several of the deputies in Cedar County had either been volunteer officers before they were formal deputies. I did not parcel that out in my assessment of Jason Britt. If they were in fact under some code of law enforcement conduct while they were at Agape, while they worked or volunteered at Agape or participated in keeping students at Agape, then I would think that would be relevant. If they had absolutely no contact with Agape, didn't work there, didn't volunteer there, had nothing, then that would reduce the likelihood that I would think they would be culpable. But at this point I haven't seen their depositions, I don't know some of that information. I remain open to the possibility both that they had a larger role as law enforcement or they maybe didn't have any role at all.
>
> …
>
> Q. As you sit here today are you prepared to offer any testimony regarding Robert Graves causing any physical abuse and/or the death of Jason Britt?
>
> A. Again, I told you earlier, I would love to see -- I would hold my opinion until I see his deposition.

(Doc. 172-1, page 14 lines 4 - page 15 line 25). While Dr. Peterson has opined about the alleged trauma that was inflicted upon Jason Britt while at Agape, nothing within his Report or deposition would assist the trier of fact in finding Defendant Graves' role with either the Cedar County Sheriff's Department or Agape from 2009 to 2010. For these reasons, Cedar County Defendants' Daubert Motion to exclude all testimony of Plaintiff's expert Dr. Peterson as it relates to Defendant Graves is **GRANTED**.

### C. Defendant Cedar County, Missouri

The Report and deposition testimony provided by Dr. Peterson would not assist the trier of fact as it relates to Defendant Cedar County, Missouri. In Dr. Peterson's Report he talks about the role that Cedar County law enforcement played regarding Jason Britt's mentality. Specifically, the Report states "[t]hese reinforced that nothing was within his control to escape form Agape Boarding School. Not even the police would help him escape the damaging abuses he was experiencing, thereby heightening his sense of captivity." (Doc. 180-2, page 10). The Report further asserts:

> In addition, those who acted to collude with Agape Boarding School, such as Cedar County law enforcement officers who were also employed by Agape, were complicit in the damages caused to Jason Britt. Such officers were mandated report[er]s with a role to protect vulnerable children.

(Doc. 180-2, Page 13). During Dr. Peterson's deposition, he was asked about whether he had formed an opinion regarding Defendant Cedar County, Missouri which shows the following conversation:

> Q. Would your opinion right now as we sit here today be that you don't have an opinion regarding the actions of Cedar County, Missouri as it relates to abuse of and/or causing the death of Jason Britt but that you would reserve that until further time; is that accurate?
>
> A. That's almost accurate. My sense is that kids at -- if they left -- if they escaped from Agape that the police would bring them back and so that's why the

8

big question mark is there. And I would say that if that's accurate, if kids eloped from Agape because of being treated cruelly and the officers didn't listen to them and took them back, then yes they would have a role and I would have opinions about that.

Q.      Jason Britt never escaped, did he?

A.      No, but Mr. Dudley did. And so in terms of context, it raises the question that if he felt that way, then other kids may have felt that way and so that's why I wanted to reserve and hear what the deposition says.

Q.      And Mr. Dudley, he's not a party to this case, is he?

A.      No. His information is certainly background.

Q.      But with respect to Jason Britt, his abuse and his death, there is no evidence regarding him trying to escape that would have put Cedar County into I guess a liability box like you were talking about with Mr. Dudley; is that fair?

A.      Unfortunately I think -- I'm not a lawyer but I think liability issues, that may be a legal question about liability. In terms of the mindset that they -- that you couldn't escape, that would be a psychiatric or a psychological element which I would want to explore.

Q.      As we sit here today do you have an opinion that Cedar County, Missouri caused or contributed to cause Jason Britt's death?

A.      I haven't ruled out that they did contribute -- they caused or contributed to cause if that is in fact accurate that they would take kids back.

Q.      Okay. Well, this case isn't about kids plural, it's about Jason Britt; correct?

A.      Yes. I'm sorry, I completely agree with you it's about Jason Britt. I understand that, I'm just saying I have wider information that suggests that there was a mindset of Agape staff that kids couldn't -- that if they left they would either -- they would be punished -- or be punished if they left but they would also be brought back by police. I may have -- that may be from The Kansas City Star article. But at the time I wrote my report I did not have the statements of any of the Cedar County staff, that's why I'm being equivocal with you. And I don't -- I'm not trying to be, you know, evasive, I'm just telling you that in my mind, having evaluated many children who are sexually and physically abused, if it is accurate that they felt the police would bring them back if they escaped, then that is a variable that will keep them quiet and keep them from -- and that would have been operative for Jason Britt.

(Doc. 172-1, page 16 line 5 - page 18 line 21). In review of Dr. Peterson's Report and deposition,

Dr. Peterson does not form an opinion whether Cedar County, Missouri caused or contributed to

cause Jason Britt's death. Dr. Peterson concedes that Jason Britt did not try to escape or that Jason

9

Britt had the mentality that may impose liability upon Cedar County, Missouri. For these reasons, Cedar County Defendants' Daubert Motion to exclude all testimony of Plaintiff's expert relating to Cedar County, Missouri is **GRANTED**.

### D.      Dr. Peterson's Supplemental Report

Cedar County Defendants argue that Plaintiff filed "Plaintiff's Opposition to All Defendants' Motions to Exclude Dr. Stephen Peterson as Expert Witness" and attached, among other exhibits, a 13-page document prepared by her retained expert, Dr. Peterson entitled "Response to Daubert Motions" ("Supplemental Report). Cedar County Defendants argue this Supplemental Report should be stricken because it has been provided to defense counsel after Plaintiff's expert disclosure deadline, May 9, 2025, and after the close of all discovery, August 1, 2025. In support Cedar County Defendants assert that Plaintiff first provided this Supplemental Report on September 23, 2025, well after her deadline to do so and too late to supplement the disclosures.[1]

Pursuant to the Third Amended Scheduling Order ("Scheduling Order") Plaintiff "shall designate any expert witnesses on or before May 9, 2025." (Doc. 111, page 3). "The expert's testimony will be limited to opinions and information contained in the report and in any depositions that might be taken." *Id*. Further, the Scheduling Order ruled that discovery would close in this case on August 1, 2025. *Id*.

Here, Dr. Peterson's Response to Daubert Motions is considered untimely. As reflected in the record, Plaintiff filed her Suggestions in Opposition, including Dr. Peterson's Response to

---

[1] Plaintiff was unable to rebut this argument as it was first raised in Cedar County Defendant's Reply Brief based upon the addition of Plaintiff's inclusion of Dr. Peterson's Response to Daubert Motions filed with Plaintiff's Suggestions in Opposition.

Daubert Motions, on September 23, 2025. (Doc. 180). This filing was made approximately four and a half months after her expert deadline and over a month and a half after the close of discovery. (Doc. 111). Plaintiff made no effort to supplement Dr. Peterson's Report, nor ask for any extensions of the deadlines. Plaintiff should have been aware that further supplementation was needed as Dr. Peterson acknowledged in his Report that he would need to corroborate his findings with the medical records that had yet to be delivered to him before the expert deadline. (Doc. 180-2). Instead, Plaintiff waited until a *Daubert* motion was filed to address the deficiencies outlined by Defendants in this matter. As the Scheduling Order explicitly states that the "expert's testimony will be limited to opinions and information contained in the report and in any depositions that might be taken" the Court will hold Plaintiff to that standard. For the reasons stated, Cedar County Defendants' Motion to Exclude Dr. Peterson's Response to Daubert Motions is **GRANTED**.

## II.     Defendant Agape's Motion to Exclude Testimony

Defendant Agape argues that Dr. Peterson's opinions are not based on sufficient facts or data. Specifically, Defendant Agape argues that Dr. Peterson's opinions are based on a two-and-a-half-hour hearsay interview of the Decedent's mother; reliance on unsworn journalistic accounts as "background"; the Report was missing core medical records for causation; and the Report concedes that Dr. Peterson cannot formulate an actual DSM-5-TR diagnoses. Defendant Agape further argues that Dr. Peterson's Report cites literature that does not do what Dr. Peterson asks of it; the medical-causation opinions exceed his basis and rest on non-record internet summaries; and that there exists a fee/interest bias. The Court will evaluate each of these arguments in turn.

### A.     Sufficient Facts or Data

### i.     Interview with Plaintiff

11

Defendant Agape argues that Dr. Peterson's Report is based on a two-and-a-half-hour hearsay interview of Jason Britt's mother is the linchpin factual source. Defendant Agape asserts that Dr. Peterson relies heavily on a single collateral interview rather than clinical examination, testing, or treating records. Plaintiff does not argue these points directly within her briefing; however, she has provided the Court with Dr. Peterson's Response to Daubert Motions. (Doc. 180-3). As the Court has already struck Dr. Peterson's Response to Daubert Motions it will proceed without the aid of Plaintiff's argument on this issue.

Federal Rule of Evidence 703 allows "an expert [to] rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field." *Giger Welding & Fabrication, LLC v. DFW Movers & Erectors, Inc.*, No. 4:21-CV-00741-DGK, 2026 WL 382905, at *5 (W.D. Mo. Feb. 11, 2026) (quoting *Brennan v. Reinhart Institutional Foods*, 211 F.3d 449, 450 (8th Cir. 2000)) (citations omitted).

The interview Dr. Peterson conducted with Plaintiff has sufficient facts or data that generally concerns a Diagnostic Record Review. To properly perform a Diagnostic Record Review, it is expected that an expert would rely on interviews with various individuals to get an understanding regarding an individual's mental state. Here, Dr. Peterson's interview with the Plaintiff, Jason Britt's mother, would be the type of interview expected by an expert in this field. Further, Dr. Peterson's Report establishes that besides his two-and-a-half-hour interview with Plaintiff, Dr. Peterson's Report was also based on 69 different materials used in part to create his Report. (Doc. 180-2, pages 2-4). Dr. Peterson's Curriculum Vitae establishes he is a psychiatrist with over 39 years of experience in the field of psychiatry and forensic psychiatry and has demonstrated doing these types of Diagnostic Record Reviews. (Doc. 180-1). Based on Dr.

12

Peterson's experience, his Report and Federal Rule of Evidence 703, the Court finds that Dr. Peterson's interview with Plaintiff had sufficient facts or data for the purpose of a Diagnostic Record Review. For that reason, Defendant Agape's Motion to Exclude as it relates to Dr. Peterson's interview with the Plaintiff is **DENIED**. However, Defendants will be given ample opportunity to cross-examine the Plaintiff and Dr. Peterson regarding their two-and-a-half interview and the basis for which Dr. Peterson attributed the findings of his report based on said interview. Further, whether hearsay information relayed to Dr. Peterson will be admitted as substantive evidence to stand as the basis of a verdict will be evaluated at trial on an item-by-item basis.

### ii.    Journalistic Accounts

Defendant Agape asserts that media articles appear on Dr. Peterson's material index and were expressly referenced during the Report and deposition. Defendant Agape argues that reliance on unsworn journalistic accounts as "background" does not supply sufficient facts or data when the same propositions are, if at all, provable through medical or forensic records. Plaintiff states that Defendant Agape is presumably concerned that Dr. Peterson is basing his opinion that Jason Britt was sexually abused at Agape solely on the Kansas City Star articles. However, Plaintiff argues that Dr. Peterson specifically documented medical records that support the allegation in the matter that all set forth in varying detail the sexual abuse alleged at Agape Boarding School. Plaintiff further argues that Dr. Peterson also testified that the collateral interviews impacted his opinions with regard to the alleged rapes themselves.

Dr. Peterson's use of the Kansas City Star articles in his Report was not based on sufficient facts and data. Dr. Peterson's Report denotes two Kansas City Star articles, one dated July 22, 2022, and another dated November 7, 2023. (Doc. 180-2, page 3). Dr. Peterson references the

13

Kansas City Star article within his discussion of mental disease or defect stating "as a consequence of the [childhood sexual assault], Jason described to his mother and in the June 12, 2021 (updated July 22, 2022) KC Star article events that would fulfill criteria for Posttraumatic Stress Disorder (PTSD). (Doc. 180-2, page 9). In Dr. Peterson's deposition he was asked why he would include the Kansas City Star articles in which the conversation went as follows:

> Q. Would you agree that your psychological autopsy in this case is based in part on a Kansas City newspaper article?
>
> A. In terms of the -- in terms of my final opinion it's background information, it did not supersede any of the medical information.
>
> Q. I mean, you wouldn't do a psychological autopsy and base your opinion based on some media account, I take it?
>
> A. Oh, I most certainly didn't and wouldn't. I would reference anything that I read in a newspaper article to facts or persons I could talk to.
>
> Q. And if you didn't in this case and you wouldn't rely on media as part of a psychological autopsy, then I wonder why in your file you've got media reports from The Kansas City Star?
>
> A. Well, it provides context, it doesn't -- that's why. There's information that may not be available any other way but it doesn't provide necessarily final information.

(Doc. 180-4, page 5 lines 16 - page 6 line 11). In review of Dr. Peterson's Report, the use of information derived from the Kansas City Star articles does not contain facts or data that are the type reasonably relied upon by experts. As emphasized in Dr. Peterson's Deposition above, the use of media accounts would not be the type reasonably relied on by experts within Dr. Peterson's field. While Dr. Peterson attempts to downplay the role these articles had within his Report, the articles are still hearsay as they are an out-of-court statement not made under oath and not subject to cross-examination by the opposing party. As these articles do not contain sufficient facts and data upon which experts in Dr. Peterson's field would rely, the Court finds those references and information derived from the Kansas City Star articles to be improper. For these reasons, Defendant Agape's Motion to Exclude Dr. Peterson's Testimony with respect to his use of

14

journalistic accounts is **GRANTED**. Those references and information that were derived from the Kansas City Star articles are hereby stricken.

### iii.      Core Medical Records

Defendant Agape argues that core medical records are missing for causation. Specifically, Defendant Agape argues that Dr. Peterson acknowledges that key cardiovascular/nephrology records from St. Luke's and St. Alphonsus were not yet available and that any causation discussion would be deferred until after review of those records. Defendant Agape states that the absence of those underlying medical records underscores the analytical gap between Dr. Peterson's limited factual basis and his broad causation conclusions arguing it should be excluded. Plaintiff argues that Dr. Peterson did indicate in his Report that the general causation would require confirmation from the medical records, that although requested, had not yet been received at the time of his Report. Plaintiff states that the medical records were subsequently received, and Dr. Peterson did confirm in his deposition that the records confirmed his opinions on general causation.

Dr. Peterson's Report has been supported by his deposition testimony. Plaintiff is correct that at the time Dr. Peterson filed his Report he did not have access to the medial records from St. Luke's or St. Alphonsus.[2] However, Dr. Peterson was provided with those records and reviewed them before his deposition. (Doc. 172-1, page 20 line 21- page 21, line 12). As Dr. Peterson's deposition testimony shows, he was able to review the core medical records in this case and provide an opportunity for Defendants to depose him on the issue. For the reasons stated,

---

[2] Dr. Peterson noted he would have to confirm with the St. Luke's and St. Alphonsus records. (Doc. 180-2, pages 9-10).

Defendant Agape's Motion to Exclude Dr. Peterson's Testimony based on a lack of sufficient facts and data as to the core medical records is **DENIED**.

### iv. Formulation of Diagnoses

Defendant Agape argues that Dr. Peterson concedes he cannot diagnose Jason Britt and that Dr. Peterson's provisional descriptions are not reliably applied. Defendant Agape asserts that Dr. Peterson's Report repeats his findings are "provisional through highly likely." Defendant Agape argues that this concession underscores that Dr. Peterson did not, and on his methodology cannot, formulate actual DSM-5-TR diagnoses here. Plaintiff argues that the American Psychiatric Association Rules of Professional Ethics prevents the offering of professional opinions based on publicly available information without conducting an examination. However, Plaintiff argues that the opinion also states that the rendering of opinions and expertise in forensic and consultative roles is permissible because the work is conducted within an evaluative framework including parameters for how and where the information may be used or disseminated. Plaintiff states that Dr. Peterson carefully delineated that he could not provide a "diagnosis" of Jason Britt because he is deceased and cannot now be interviewed. Plaintiff argues that Dr. Peterson was able to conduct a Psychiatric Autopsy which was the foundation for his opinion that Jason Britt had DSM-5-TR Child Sexual Abuse and DSM-5-TR Posttraumatic Stress Disorder due to his time at Agape.

The American Psychiatric Association Ethics Committee formulated an opinion regarding whether a psychiatrist may give an opinion about an individual in the public eye when the psychiatrist, in good faith, believes that the individual poses a threat to the country or national security. While not a direct comparison to the case at hand, it provides a useful insight into the ethics governing whether Dr. Peterson may give a diagnosis or opinion in this case. The APA Ethics Committee stated in relevant part:

16

Section 7.3 of *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry* (sometimes called the "The Goldwater Rule") explicitly states that psychiatrists may share expertise about psychiatric issues in general but that it is unethical for a psychiatrist to offer a professional opinion about an individual based on publicly available information without conducting an examination. Making a diagnosis, for example, would be rendering a professional opinion. However, a diagnosis is not required for an opinion to be professional. Instead, when a psychiatrist renders an opinion about the affect, behavior, speech, or other presentation of an individual that draws on the skills, training, expertise, and/or knowledge inherent in the practice of psychiatry, the opinion is a professional one. Thus, saying that a person does not have an illness is also a professional opinion.

Psychiatrists have also argued that the "Goldwater Rule" is not sound because psychiatrists are sometimes asked to render opinions about conducting an examination of an individual. Examples occur, in particular, in certain forensic cases and consultative roles. This objection attempts to subsume the rule with its exceptions. What this objection misses, however, is that the rendering of expertise and/or an opinion in these contexts is permissible because there is a court authorization for the examination (or an opinion without examination), and this work is conducted within an evaluative framework including parameters for how and where the information may be used or disseminated. In addition, any evaluation conduced or opinion rendered based on methodology that departs from the established practice of an in-person evaluation must clearly identify the methods used and the limitations of those methods, such as the absence of an in-person examination.

(Doc. 180-5, pages 2-3).

Dr. Peterson's Report is supported by sufficient facts and data concerning his opinion regarding whether Jason Britt exhibited symptoms consistent with DSM-5-TR Child Sexual Abuse and DSM-5-TR- Posttraumatic Stress Disorder. Dr. Peterson within his Report and in his deposition remarked that he could not make a diagnosis because of the governing ethics rule as he could not personally interview Jason Britt. However, Dr. Peterson does note within his Report that "[i]n Jason Britt's situation, his treatment at Agape Boarding School caused symptoms that were undeniably consistent with severe anxiety disorder, depression (suicidal ideation; attempt), posttraumatic stress disorder, sleep disorder, and high risk for suicide attempts." (Doc. 180-2, page 12). Although Dr. Peterson cannot make a formal diagnosis, he has made an opinion noting that

17

these symptoms are consistent with the disorders cited above and are backed by sufficient facts and data as delineated in the Report and talked about in his deposition. For these reasons, Defendant Agape's Motion to Exclude Dr. Peterson's Testimony based on the inability to formulate a diagnosis is **DENIED**.

### B. Literature

Defendant Agape argues that the literature cited in Dr. Peterson's Report does not provide a basis for the conclusions ascertained from those sources. Defendant Agape challenges three citations in Dr. Peterson's Report. Plaintiff does not argue these points directly within her briefing and the Court has already struck Dr. Peterson's Response to Daubert Motions. Thus, the Court will analyze these articles separately without a response from the Plaintiff.

### i. *Complex Trauma in Adolescents and Adults*

Defendant Agape argues that the citation of Briere & Scott, *Complex Trauma in Adolescents and Adults: Effects and Treatment, 38 Psychiatric Clinics of North America* 515 (2015) does not provide a validated method for post-hoc diagnosing a decedent without examination or records, nor for attributing a later cerebrovascular event to complex PTSD.

Dr. Peterson's reliance on *Complex Trauma in Adolescents and Adults: Effects and Treatment* was not appropriately used in his Report. Here, Dr. Peterson's Report states:

> First, Jason experienced Complex Trauma due to four months of traumatic experiences that included physical assault, rape, and emotional/nutritional/interpersonal torture when he was a 16-year-old (Complex Trauma in Adolescents and Adults: Effects and Treatment (Briere and Scott; Psychiatric Clinics of North America; 2015; in press).

(Doc. 180-2, page 10). The passage cited from Dr. Peterson's Report shows the only citation of the challenged article. From a plain reading of the Report, it stands for the proposition that Jason Britt

18

suffered complex trauma. However, Dr. Peterson never adduces what complex trauma is within the Report or how the cited article contributes to that understanding. Here, Dr. Peterson skips to the factual application without providing any foundational support for the article cited. For this reason, Defendant Agape's Motion to Exclude Dr. Peterson's use of *Complex Trauma in Adolescents and Adults: Effects and Treatment* is **GRANTED**. The cited article as shown in the above paragraph will be stricken.

### ii.    *Sexual Abuse and Lifetime Diagnosis of Psychiatric Disorders*

Defendant Agape argues that Dr. Peterson's reliance on Chen et al., *Sexual Abuse and Lifetime Diagnosis of Psychiatric Disorders: Systematic Review and Meta-Analysis, 85 Mayo Clinic Proceedings* 618 (2010) does not establish causation in an individual case or validate psychological-autopsy diagnoses absent clinical evaluation and records.

Dr. Peterson's reliance on *Sexual Abuse and Lifetime Diagnosis of Psychiatric Disorders; Systematic Review and Meta-Analysis* was appropriately used in his Report. Dr. Peterson's Report states:

> Fifth, children who experience sexual abuse are at high risk for psychiatric disorders (Sexual Abuse and Lifetime Diagnoses of Psychiatric Disorders; Systematic Review and Meta-analysis; Chen et. al.; Mayo Clinic Proceedings; July 2010: 85 (7) 618-629). By way of example, in more than 3,100,000 participants, there was a statistically significant association between sexual abuse and lifetime diagnoses of anxiety disorder, depression, eating disorders, posttraumatic stress disorder, sleep disorders, and suicide attempts. These associations persisted regardless of the victim sex, or age when the abuse occurred. Associations between sexual abuse and depression, eating disorders, and PTSD were strengthened by history of rape.

(Doc. 180-2, pages 11-12). The passage cited from Dr. Peterson's Report shows the only citation of the challenged article. From a plain reading of the Report, it stands for the proposition of highlighting the association between sexual abuse and lifetime diagnoses. Dr. Peterson does not

19

attempt to use this article to establish causation or validate psychological-autopsy diagnoses absent clinical evaluation and records. In this context the Court finds this article serves its purpose and does not create a reason to exclude this proposition from Dr. Peterson's Report. For the reasons stated, Defendant Agape's Motion to Exclude Dr. Peterson's use of *Sexual Abuse and Lifetime Diagnosis of Psychiatric Disorders; Systematic Review and Meta-Analysis* is **DENIED**.

        iii.      ***Factors Associated with Delays of Days to Decades to Criminal Prosecutions of Child Sexual Abuse***

Defendant Agape argues that Dr. Peterson's citation of Connolly et al., *Factors Associated with Delays of Days to Decades to Criminal Prosecutions of Child Sexual Abuse, 33 Behavioral Sciences & the Law* 546 (2015) offers no methodology for diagnosing PTSD in a deceased adult or attributing medical death causally to trauma.

Dr. Peterson's reliance on *Factors Associated with Delays of Days to Decades to Criminal Prosecutions of Child Abuse* was appropriately used in his Report. Dr. Peterson's Report states:

> Third, it is well known that children who do not immediately report episodes of sexual abuse can suffer in silence for up to decades before they are able to overcome the internal stigma of having been abused and disclose (Factors Associated with Delays of Days to Decades to Criminal Prosecutions of Child Sexual Abuse; Connolly, et al.; Behavioral Sciences and the Law; 2015; 33:546-560). Notably, for adolescents (greater than 13 years old) who are sexually abused by someone who has a community connection (such as at Agape Boarding School) delay to reporting for male students can last as long as 19.24 years $\pm$ almost 12 years.

(Doc. 180-2, page 11). The passage cited from Dr. Peterson's Report shows the only citation of the challenged article. From a plain reading of the Report, the article stands for the proposition that children who do not immediate report sexual abuse can wait for decades before being able to report. Dr. Peterson does not attempt to use this article to diagnose PTSD or attributing medical death causally to trauma but to explain why a long lapse may accrue before an individual discloses

20

that abuse. In this context the Court finds the article serves its purpose and does not create a reason to exclude this proposition from Dr. Peterson's Report. For the reasons stated, Defendant Agape's Motion to Exclude Dr. Peterson's use of *Factors Associated with Delays of Days to Decades to Criminal Prosecutions of Child Abuse* is **DENIED**.

### C. Medical-Causation Opinion

Defendant Agape asserts that Dr. Peterson relies on a Medscape webpage to describe systemic/cardiovascular effects of anabolic steroids and speculates that Jason Britt had two heart attacks and stroke-related sequelae, while expressly awaiting St. Luke's and St. Alphonsus medical records. Defendant Agape argues this is not a reliable application of any psychiatric method to case-specific facts and strays beyond his demonstrated foundation. Plaintiff states that Dr. Peterson explained that Medscape is a well-regarded source of medical information, accessible on the internet. Plaintiff argues that Medscape is a peer reviewed medical information platform that is jointly accredited by the Accreditation Counsel for Continuing Medical Education ("ACCME"), the American Nurses Credentialing Center ("ANCC") and the Accreditation Counsel for Pharmacy Education ("ACPE") to pride continuing education for physicians, nurses and pharmacists.

Dr. Peterson's medical-causation opinion relies upon a reliable methodology. In Dr. Peterson's Report, he qualified his answers in the mental disease or defect section by stating that his findings would need to be confirmed with the St. Luke's and St. Alphonsus medical records which he had yet to receive as of the filing of his Report. (Doc. 180-2, pages 9-10). In researching the unregulated anabolic androgenic steroid abuse Dr. Peterson utilized Medscape which is accredited by the ACCME, ANCC and ACPE.[3] Further, Dr. Peterson testified in his deposition that

---

[3] Medscape, https://help.medscape.com/hc/en-us/articles/360001561071-Are-continuing-medical-education-CME-CE-courses-on-Medscape-accredited (last visited Mar. 26, 2026).

once he received the medical records from St. Luke's and St. Alphonsus, they confirmed his findings in his original Report. (Doc. 180-4, page 8, lines 4-23). The court finds that Dr. Peterson's Medical-Causation opinion was based on a reliable methodology. For these reasons, Defendant Agape's Motion to Exclude Dr. Peterson's Testimony regarding his medical-causation opinion is **DENIED**.

### D.      Fee/Interest Bias

Defendant Agape states that Dr. Peterson charges $375 an hour for review/assessment/report writing and $400 an hour for testimony, with travel at $150 an hour. Defendant Agape concedes that this compensation does not itself warrant exclusion but underscores the need for rigorous Federal Rule of Evidence 702 gatekeeping given the methodological and factual deficiencies noted within its briefing. Plaintiff does not argue these points directly within her briefing; and the Court has already struck Dr. Peterson's Response to Daubert Motions. Thus, the Court will proceed on its analysis of this issue without the aid of Plaintiff's argument.

The Court finds that Dr. Peterson's compensation is reasonable given the amount charged for this kind of work in this area of the country. Nothing submitted in the briefing would lead this Court to the conclusion that there is any inherent fee/interest bias presented by Dr. Peterson. For this reason, Defendant Agape's Motion to Exclude Dr. Peterson's Testimony based on his fee or interest bias is **DENIED**. Dr. Peterson's fee may be explored in cross-examination.

### CONCLUSION

For the reasons stated, Cedar County Defendants' Motion to Exclude/Daubert Motion is **GRANTED**. Dr. Peterson may not opine that Defendant McCrary, Graves or Cedar County,

Missouri caused or contributed to cause Jason Britt's death and Dr. Peterson's Response to Daubert Motion is stricken.

Defendant Agape's Motion to Exclude Testimony of Plaintiff's Expert Dr. Peterson is **GRANTED IN PART AND DENIED IN PART**. Defendant Agape's Motion to Exclude Dr. Peterson's Testimony based on a lack of sufficient facts and data as to the interview with Plaintiff, core medical records and formulation of diagnosis are **DENIED**. Defendant Agape's Motion to Exclude Dr. Peterson's Testimony with respect to his use of journalistic accounts is **GRANTED**. Those references and information that were derived from the Kansas City Star articles are hereby stricken and may not be referenced to or used as the basis of, or as support for, Dr. Peterson's testimony. Defendant Agape's Motion to Exclude Dr. Peterson's Testimony based on the article *Complex Trauma in Adolescents and Adults: Effects and Treatment, 38 Psychiatric Clinics of North America* 515 (2015) is **GRANTED**. The cited article in Dr. Peterson's Report will be stricken. Defendant Agape's Motion to Exclude Dr. Peterson's Testimony based on the articles *Sexual Abuse and Lifetime Diagnosis of Psychiatric Disorders: Systematic Review and Meta-Analysis, 85 Mayo Clinic Proceedings* 618 (2010) and *Factors Associated with Delays of Days to Decades to Criminal Prosecutions of Child Sexual Abuse, 33 Behavioral Sciences & the Law* 546 (2015) are **DENIED**. Defendant Agape's Motion to Exclude Dr. Peterson's Testimony based on medical-causation opinion and fee/interest bias are also **DENIED**.

**IT IS SO ORDERED.**

Dated: April 2, 2026

*/s/ Douglas Harpool*
**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**

23